IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| KEIKO ONO AOKI and<br>BENIHANA OF TOKYO, INC.<br><br>             Plaintiffs,<br><br>      v.<br><br>BENIHANA, INC.,<br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>) Civ. No. 11-489-SLR<br>)<br>)<br>)<br>) |

David M. Powlen, Esquire and Kevin G. Collins, Esquire of Barnes & Thornburg LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: James R. Burdett, Esquire, Joseph D. Lewis, Esquire and Mark R. Owens, Esquire of Barnes & Thornburg LLP.

Robert W. Whetzel, Esquire and Todd A. Coomes, Esquire of Richards, Layton & Finger, PA, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Alan H. Fein, Esquire and Joshua Munn, Esquire of Stearns Weaver Miller Weisler Alhadeff & Sitterson, P.A.

**MEMORANDUM OPINION**

Dated: July 22, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

On June 2, 2011, Keiko Ono Aoki ("Aoki") and Benihana of Tokyo, Inc. ("BOT,"

collectively "plaintiffs") filed a complaint against Benihana, Inc. ("BI" or "defendant") for

defamation and injurious falsehood. (D.I. 1) Plaintiffs filed an amended complaint on

July 11, 2011. (D.I. 9) BI moved to dismiss both counts pursuant to Federal Rule of

Civil Procedure 12(b)(6) and to strike plaintiffs' prayer for relief, allegations and exhibits.

(D.I. 16, 18)

On March 15, 2012, the court issued a memorandum opinion denying

defendant's motion to strike, denying defendant's motion to dismiss as to the

defamation count and granting defendant's motion to dismiss as to the injurious

falsehood count. (D.I. 25) On December 17, 2012, defendant filed an answer to the

amended complaint. (D.I. 14)

A scheduling order was entered on January 10, 2013, setting deadlines for

discovery, dispositive motions and conferences.[1] (D.I. 43) On February 19, 2014,

defendant filed a motion for summary judgment. (D.I. 50) The matter is fully briefed.

(D.I. 51, 52, 55, 56, 57) The court has jurisdiction pursuant to 28 U.S.C. § 1332.

---

[1]Pursuant to the scheduling order, all discovery was due by January 24, 2014.
(D.I. 43) According to defendant, plaintiffs "have offered inadequate responses" to
discovery requests, "while at the same time declining to propound any discovery of their
own . . . . [Plaintiffs] have served no affirmative discovery and have not taken any
depositions . . . ." (D.I. 51 at 5) During this same period, plaintiffs state that "[t]he
parties have been and continue to be engaged in settlement discussions concerning
this matter and the related Florida litigation. . . [and] [p]laintiffs believed the parties had
an agreement in principle. These discussions were the parties' focus during the
discovery period." (D.I. 55 at 1)

## II. BACKGROUND[2]

Rocky Aoki, the founder of the original Benihana restaurant and of plaintiff BOT, passed away on July 10, 2008. His wife, at the time, was plaintiff Aoki. By virtue of her powers as sole executor of Rocky Aoki's estate and sole trustee of the testamentary trust created in Rocky Aoki's will, plaintiff Aoki was elected Chief Executive Officer of BOT. BOT is the owner of a substantial shareholder interest in the common voting stock of defendant.

On December 3, 2010, BOT initiated a lawsuit against BI and Noodle Time, Inc.[3] ("Delaware I litigation")[4] arguing, inter alia, that defendants in that matter were in breach of contract and were infringing BOT's trademark rights in certain disputed countries.

On May 17, 2011, BI, Noodle Time and Benihana National Corporation[5] (collectively "Florida plaintiffs") initiated an action in the State of Florida ("Florida litigation" and "Florida complaint"), against Aoki, BOT and Takanori Yoshimoto ("Yoshimoto," collectively "Florida defendants"). In the Florida litigation, BI claimed "breach of contract, civil conspiracy, injury to business reputation, violations of the deceptive and unfair trade practices act, disparagement, tortious interference, and unfair competition" allegedly arising out of the Florida defendants' "deceptive, unfair and

---

[2]Unless otherwise noted, this background is derived from the court's memorandum opinion of March 15, 2012. (D.I. 25)

[3]Noodle Time Inc. ("Noodle Time") is a subsidiary of BI and not a party to the present action.

[4]Civ. No. 10-1051-SLR.

[5]Benihana National Corporation is also a subsidiary of BI and not a party to the present action.

2

unlawful conduct relating to their disparagement of [Florida plaintiffs] in an attempt to

dilute the value of [BI], discourage prospective purchasers from purchasing stock in

[BI],and to deceive the public into believing that the title to the BENIHANA®

Trademarks is in question when it is not." (D.I. 17, ex. 1 at ¶ 1, ¶¶ 50-90)

> The Florida complaint alleges that,

> [i]n or about July 2010[, BI] announced it was looking at strategic
> alternatives, including a possible sale, in order to maximize shareholder
> value. BI, by and through one of its advisors, began a competitive bidding
> process and solicited third parties with respect to a possible transaction.
> Upon learning of the process, Defendants undertook a course of action
> to disparage BI in an effort to frustrate the Company's ability to maximize
> the interests of Benihana and its shareholders.
> On December 3, 2010, BOT filed a lawsuit against BI and Noodle Time
> alleging various causes of action unrelated to the claims herein, and
> immediately sought to publicize the lawsuit.  On December 8, 2010, the
> Miami Herald published an article with the glaring title "New York-based
> Benihana of Tokyo Sues Benihana, Inc. of Miami."  Counsel for BOT is
> quoted in the article as saying, "The Miami guys are now busy registering
> [Benihana marks] all over the place and claiming they're doing it with
> authorization . . .
> The Delaware Lawsuit was aimed at causing prospective purchasers to
> question BI's relationship with BOT, the value of BI's assets, and the stability
> of the company.
>                       *                  *                  *
> Upon information and belief, Keiko Aoki intended to discourage interested
> parties, and to tortiously interfere with BI's relationships, in order to retain
> control of the Aoki family trust and consequently, BOT.

(*Id.* at ¶¶ 27-30, ¶ 43)

Through its publicist, Kekst and Company, and in concert with PR Newswire

Association LLC and Comtex News Network, Inc., BI issued a press release ("press

release") announcing the Florida litigation.  The dateline of the press release read

"MIAMI, May 18, 2011 /PRNewswire via COMTEX/ -."  In relevant part, the press

release stated:

3

Benihana Inc. (NASDAQ: BNHN; BNHNA) ("Benihana"), operator
of the nation's largest chain of Japanese theme and sushi restaurants,
today announced that it, together with its affiliates Benihana National
Corp. and Noodle Time (collectively "the Plaintiffs"), has filed a complaint
against Benihana of Tokyo, Inc. ("BOT"), Keiko Aoki, and Takanori
Yoshimoto (collectively "the Defendants") in the Circuit Court of the
Eleventh Judicial Circuit in and for Miami-Dade County, Florida.
According to the Complaint, Aoki, motivated by a desire to perpetuate
her position of control over BOT and influence over Benihana,
directed BOT and Yoshimoto to engage in actions damaging to
all Benihana stockholders, including BOT's other beneficiaries.
The Complaint details the Defendants' breach of contract, civil
conspiracy, injury to business reputation, violation of the Florida
Deceptive and Unfair Trade Practices Act, tortious interference,
and unfair competition arising out of the Defendants' deceptive,
unfair and unlawful conduct relating to their disparagement
of the Plaintiffs. Through these actions, the Defendants have
deliberately attempted to dilute the value of Benihana and deceive
the public into believing that the title to the BENIHANA® Trademarks
is in question when it is not, according to the Complaint.
Benihana said that it has pursued this litigation in order to
protect the interests of its shareholders from the Defendants' alleged
self-serving actions and agenda.

(D.I. 52, ex. 1 at 3) On June 2, 2011, plaintiffs filed the action at bar. (D.I. 1)

## III. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of

demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact

cannot be – or, alternatively, is – genuinely disputed must demonstrate such, either by

citing to "particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those

made for the purposes of the motions only), admissions, interrogatory answers, or other

4

materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

5

## IV. DISCUSSION[6]

Under New York law, defamation is "the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Dillon v. City of New York*, 261 A.D.2d 34, 38 (N.Y.App.Div. 1999).  The elements are:  (1) a false statement; (2) published without privilege or authorization to a third party; (3) constituting fault as judged by, at a minimum, a negligence standard; and (4) must either cause special harm or constitute defamation per se. *Id.*

In their second amended complaint, plaintiffs allege that the "press release included statements that plaintiffs engaged in unlawful conduct which was 'motivated by a desire to perpetuate [Aoki's] position of control over BOT and influence over Benihana, directed BOT and Yoshimoto to engage in actions damaging to all Benihana stockholders, including BOT's other beneficiaries.'"  (D.I. 9 at ¶ 24)  Plaintiffs claim that the allegations in the Florida Complaint are false.  (*Id.* at 33)  Defendant asserts that summary judgment is warranted because the press release statements accurately describe the allegations in the Florida complaint and, therefore, are true.  (D.I. 51)

"Whether particular words are defamatory presents a legal question to be resolved by the court in the first instance." *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 177 (2d Cir. 2000) (*quoting Aronson v. Wiersma*, 65 N.Y. 2d 592, 593

---

[6]The court has determined that New York law applied to the defamation claim. (D.I. 25 at 10)

6

(1985)). The New York Court of Appeals has developed the following test to determine

whether a statement or publication is defamatory:

> (1) give the disputed language a fair reading in the context of the
> publication as a whole. "Challenged statements" "must be perused
> as the average reader would against the 'whole apparent scope and
> intent' of the writing;"
> (2) do not "strain to interpret such writings 'in their mildest and most
> inoffensive sense to hold them nonlibelous.' A fair reading controls;" and
> (3) construe the words "not with the close precision expected from
> lawyers and judges but as they would be read and understood by the
> public to which they are addressed. It is the meaning reasonably
> attributable to the intended reader that controls."

*Celle v. Filipino Reporter Enterprises. Inc.*, 209 F.3d at 177-78 (citations omitted).

Considering this authority against the press release and Florida Complaint, the

court finds that the press release accurately describes the allegations in the Florida

Complaint. In the second paragraph of the press release, there are several specific

instances of limiting language ("according to the Complaint" and "the Complaint

details"), which demonstrate that the press release is a summary of the allegations in the

Florida Complaint. Despite plaintiffs' protestations to the contrary, the veracity of the

Florida Complaint is irrelevant to whether the press release accurately reflects the

Florida Complaint. Further, the court finds that the absence of the words "motivated"

and "perpetuate" from the Florida Complaint does not render the press release false,

when evaluated in its entirety.[7]

---

[7]Plaintiffs have failed to explain how their exhibits, e.g., SEC filings and investor materials, bolster their opposition to summary judgment. (D.I. 56) Nonetheless, having reviewed the material, the court concludes that these exhibits do not create a factual dispute with respect to whether the press release is false.

        Defendant also asserts that summary judgment is appropriate because its

statements are protected by the "fair and true report" privilege.  New York law

recognizes the "fair and true report" privilege which, in part, provides that "[a] civil action

cannot be maintained against any person, firm or corporation, for the publication of a fair

and true report of any judicial proceeding."  N.Y. Civil Rights Law § 74.  The purpose of

Section 74 is "the protection of [the] reports of judicial proceedings which are made in

the public interest."  *Williams v. Williams*, 23 N.Y.2d 592, 599 (N.Y. 1969).  The privilege

protects the media as well as litigants who provide a "substantially accurate description"

of the pending litigation.  *Fishof v. Abady*, 280 A.D.2d 417, 418 (N.Y. App. Div. 2001).

        A report is "fair and true" if "the substance of the article [is] "substantially

accurate."  *Holy Spirt Assen for Unification of World Christianity v. New York Times Co.*,

49 N.Y.2d 63, 67 (N.Y. 1979).  In "determining whether an article constitutes a 'fair and

true' report, the language used therein should not be dissected and analyzed with a

lexicographer's precision."  *Alf v. Buffalo News, Inc.*, 953 N.Y.S.2d 797, 799 (N.Y. App.

Div. 2012).  To that end, courts should "construe liberally both the 'fair and true'

standard."  *Fine v. ESN, Inc.*, No. 5:12-CV-0836, 2013 WL 528468, at *3 (N.D.N.Y. Feb.

11, 2013).

        Considering the press release under the liberal construction afforded the "fair

and true report privilege," the court finds that the press release accurately describes the

Florida Complaint in the ongoing judicial proceeding.  The fact that the press release

does not parrot the exact language used in the Florida Complaint is inconsequential.

8

Similarly, plaintiffs' reliance on the *Williams*[8] exception is unpersuasive because there is nothing of record reflecting that defendant "maliciously" filed the Florida Complaint alleging "false and defamatory charges."  And there is nothing to evince that defendant used the Florida Complaint as a "sham pleading prepared solely as a vehicle for publicizing false allegations, amounting to a perversion of judicial proceedings." *Williams*, 23 N.Y.2d at 599.  Although afforded the opportunity to pursue discovery on this issue, plaintiffs have failed to present any evidence to support their suppositions.[9]

## V. CONCLUSION

For all the above reasons, defendant's motion for summary judgment is granted. An order will issue.

---

[8]A plaintiff is not immune from defamation liability if he or she maliciously instituted the judicial proceeding alleging false and defamatory charges and then disseminates those allegations to the press.  *Williams*, 23 N.Y.2d 592 (1969).

[9]In light of the court's findings, it is unnecessary to consider whether plaintiffs were "all-purpose" or "limited-purpose" public figures.

9